

FILED
CLERK, U.S. DISTRICT COURT
APR 24 2014
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br>v.<br>WORLD CAPITAL MARKET INC.; WCM777 INC.; WCM777 LTD. d/b/a WCM777 ENTERPRISES, INC.; and MING XU a/k/a PHIL MING XU,<br><br>Defendants,<br><br>KINGDOM CAPITAL MARKET, LLC; MANNA HOLDING GROUP, LLC; MANNA SOURCE INTERNATIONAL, INC.; WCM RESOURCES, INC.; AEON OPERATING, INC.; AND PMX JEWELS, LTD.,<br><br>Relief Defendants. | Case No. CV-14-2334-CAS-MRW<br><br><br>**DECLARATION OF VINCENT MESSINA**<br><br><br><br>Ctrm:  5 - 2nd Floor<br>Judge: Hon. Christina A. Snyder |

VINCENT MESSINA, under penalty of perjury, hereby declares as follows:

1. I am a respondent in this proceeding, and an attorney duly licensed to practice law in the State of Florida. I submit this declaration to correct the many false assertions made by the Receiver, and to clarify the circumstances surrounding my receipt of a loan from Ming Xu.

2. First, I note that I have been a licensed attorney for more than 50 years, having obtained a Juris Doctor from the University of Virginia and a Doctorate in Taxation from New York University. My practice is focused in the area of taxation and commercial transactions, particularly those involving China and Africa. Through my many decades of practice, I have never been the subject of any disciplinary action.

3. As regards my dealings with Ming Xu prior to these events, I am aware that the Receiver refers to me as an "insider." I certainly did not consider myself an "insider" in his businesses; I actually occupied only a discrete position and was generally not privy to the operations of World Capital Markets.

4. I was hired by Ming Xu in relation to certain immigration matters in which he was involved. I came to understand, through my dealings with Xu and his associates, that he was a graduate of Harvard Business School, an experienced and accomplished businessman, and a man of enormous resources, particularly in Asia. He often spoke about the extent of his business and real estate holdings in China and elsewhere, and about his and his family's connections at the highest levels in China including with its central bank.

5. More recently, I was asked by Xu to provide some limited services in relation to the business of World Capital Markets. It was my understanding that World Capital Markets involved a structure of investor participants whose funds were then deployed in various businesses and investments to generate profits for those participants. My involvement was limited to that investment aspect of the business and, in that capacity, I sought to identify and discuss with Xu investment and business opportunities.

6. I became aware, last fall, that there was an inquiry by the Securities and Exchange Commission ("SEC") relating to World Capital Markets. I was not involved in those issues, and understood that Xu was dealing with and represented by the firm of Wellman & Warren in relation to those matters.

7. I was also advised that the issues were being resolved through a cessation of fund raising activities in the United States, and repayments to United States investors.

8. As of February, it was my understanding from Xu and others that the SEC issues had been resolved, that all money raising in the United States had ceased, and that more than $10 million of a total of approximately $28 million had already been repaid to investors. I was also told that Xu had placed the remaining repayments, a total of approximately $19 million, with an attorney named Simon Horstman to be paid to the SEC in connection with the final and formal resolution of the issues. I also understood at the time – and continue to believe – that those repayments barely scratched the surface of the resources of World Capital Markets and Mr. Xu. I was advised, for example, that the investments from participants in the United States constituted less than 30% of the revenue of World Capital Markets.

9. At a point after I had learned of the settlement of those issues, Xu and I discussed his interest in continuing our business dealings notwithstanding the closure of the United States operations. In February, he advised me that he had transferred $5,000,000 to my account to be held and applied to future business. He sent the funds using the wire information that he had, and so the funds were delivered to my IOLTA account.

10. Xu and I then spoke and he suggested that I should just "hold" the funds for future business. I declined to do so. He and I then agreed that he would loan the funds to me, that I would commit to pay interest on those funds and repay them. We also discussed his interest in being able to participate in those business ventures in the future in exchange for a reduction in the principal amount of the loan, but there was no agreement on that point. I then drafted a Loan Agreement that was executed by both Xu and me.

11. I understand that the Receiver has confirmed that Xu signed the Loan Agreement, but the Receiver also claims that the funds were paid as a retainer for legal services. That is not

3

accurate, there was no retainer agreement, and there was no legal work that I was being asked to perform. Further, Xu expressly stated to me that the funds had no connection to World Capital Markets and, in fact, the funds were transferred from an entity, ToPacific, that I understood was not associated with World Capital Markets.

12. I note also that the Receiver has claimed that Xu referred to the funds as a retainer in a letter that he later sent to me. He did not. He referred to those funds as being related to "private business" and used the word retainer only in the sense that I was someone who had, in the past, performed services for him on retainer.

13. More than a month after receiving the funds, I received a letter from the Receiver demanding return of the funds based on the Receiver's assertion that I was holding funds for Xu. I confirmed to the Receiver's counsel that those funds were not received as a retainer, and I arranged for my counsel to speak with the Receiver's counsel.

14. The Receiver has also made a number of false statements relating to the disbursement of those funds. My counsel advised the Receiver, on or about April 4, 2014, that I was still in possession of approximately $2.4 million that had not yet been disbursed for business purposes. The Receiver asked, and I agreed, to escrow those funds at the firm of Thompson Hine pending further order of the Court, and I transferred the funds to Thompson Hine.[1]

15. The Receiver has now obtained records of my Bank of America accounts and, on that basis alone, asserts that my statements regarding disbursement of the funds were false. The

---

[1] The Escrow Agreement, signed by the Receiver only two weeks ago, provided that Thompson Hine would serve as the escrow agent and hold those funds pending resolution of these issues. The Receiver is now seeking relief that is contrary to its own agreement.

4

Receiver's analysis is deficient on its face, and her claim is specious. In fact, the funds were disbursed, but the Receiver had only the records of the *initial transfers* from Bank of America and, on that basis, made the false assumption that no other disbursements had occurred.

16. In relation to the funds that were disbursed to International Market Ventures, the Receiver makes additional false statements. She asserts that Gary Messina is my son; he is not. We are related, but more significant is that Gary Messina served for thirty years within the United States government, including serving as the Chief Information Officer for the Department of Homeland Security. After leaving the government, he joined Raytheon, a leading defense contractor, and worked as a director at L-3 Communications, overseeing security and infrastructure projects in Africa and in Kuwait. He is a successful and experienced businessman, and he currently operates a consulting firm, International Market Ventures, that focuses on both information technology and business dealings in Africa and the Middle East, and represents firms in the United States and abroad.

17. With respect to the funds that were disbursed, the larger quantity went to businesses in Canada and Hong Kong. As the Receiver noted, I had declined to provide specific information regarding those businesses because the conduct of the Receiver led me to believe that the Receiver would immediately seek to destroy or disrupt those businesses. My concerns

were plainly well founded. The Receiver has now sought to freeze accounts of those businesses – accounts and businesses that I do not control.

Dated: April 24, 2014
       Los Angeles, California

_____
Vincent Messina

Sworn to before me this
day of April 2014

_____

State of California
County of Los Angeles

Subscribed & sworn to before me this April 24 2014
by VINCENT MESSINA
Proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Notary Public Signature

SALLY J. KIM
Comm. #1996582
Notary Public - California
Los Angeles County
Comm. Expires Nov 11, 2016