UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WORLD CAPITAL MARKET INC.; WCM777 INC.; WCM777 LTD. d/b/a WCM777 ENTERPRISES, INC.; and MING XU a/k/a PHIL MING XU,<br><br>Defendants,<br><br>KINGDOM CAPITAL MARKET, LLC; et al.<br><br>Relief Defendants. | Case No. CV-14-2334-JFW-MRW<br><br>**DECLARATION OF VINCENT MESSINA**<br><br>**Evidentiary Hearing**<br><br>Date:  September 5, 2014<br>Time:  8:30 am<br>Place:  Courtroom 16<br>Judge:  Hon. John F. Walter |

VINCENT MESSINA, being duly sworn, deposes and says:

1. I have been a practicing attorney for more than 50 years, having obtained a Juris Doctor from the University of Virginia and a Doctorate in Taxation from New York University. My practice has focused in the areas of taxation and commercial transactions and, more recently, immigration matters. I am licensed to practice in the State of Florida although, because I am eighty years old and a bit less active, I had elected inactive status in Florida for a period of time.

2. I understand that I have been accused by the Receiver and by the Securities and Exchange Commission of improper conduct, and I welcome the

opportunity to respond. I begin by saying that I would not and did not involve myself in any "sham" transaction with Ming Xu. While it may seem odd now, when I was dealing with him last year I understood him to be an extremely successful and well respected international business and a deeply religious man. He appeared to be dedicated to his business and determined to create substantial returns for its investors. Even when I learned of an inquiry by the SEC, both he and his attorney were adamant that there was no wrongdoing associated with the business. They later claimed that they had decided to withdraw from any activities in the United States, and had agreed with the SEC to repay the United States investors.

    3. I can also confirm that, contrary to information put forth by the Receiver, I did not violate any of the Court's orders, I did not "misappropriate" any funds, and I do not "control" PMX. The claims that I have seen regarding the Court's orders simply ignore the basic fact that the funds that I received in February 2014 were a loan and so not within the scope of the orders that the SEC sought and obtained. Further, any amounts that I received from either Ming Xu or World Capital Markets were the result of our discussions and his own decision to transfer the funds. He said that he had great respect for my business judgment, and often said that he wanted to provide financing in relation to businesses that I was interested in developing. When we then discussed the matter on February 27,

2014, it was consistent with and a continuation of those discussions, and the loan to me of $5 million was, to the best of my knowledge, not a particularly substantial disbursement to him.

4. I first met Ming Xu at a meeting at China Oil last summer in connection with business meetings relating to that company. After some further discussions regarding the business of China Oil, Xu talked with me about an immigration issue that Xu had encountered. I agreed to assist Xu in relation to that issue and placed him in contact with individuals to handle the matter on a day to day basis.

5. During the course of our dealings, Xu often spoke about himself and his business. Xu described himself as a graduate of Harvard Business School and talked about a number of successful business ventures in which he had been involved. He represented that he had substantial real estate and other holdings in Asia, and that he and his family had influence and connections at the highest levels of Chinese government and finance.

6. Xu also talked to me about the business of World Capital Markets, stating that it involved a structure of global investor participants whose funds were pooled and deployed in various businesses and investments to generate profits for the participants.

7. Last summer, Xu asked me to provide consulting services relating to World Capital Markets and I agreed. Over the next approximately six months I

provided advice generally relating to immigration matters, business and investment opportunities and referrals to other counsel as needed. For those services, during the period July 1, 2013 through February 28, 2014, I received monthly payments of $5,000.00 each from World Capital Markets, totaling $35,000.00.

8. Last December, I also discussed with Xu the formation of a political action committee relating to issues involving Africa, Asia and the Middle East. He was immediately interested in being involved and asked about the costs associated with that project. He then provided to me a check for $200,000 to be applied to that effort.

9. Also in connection with that project, I entered into a contract with International Market Ventures ("IMV"), a consulting firm based in Washington D.C. headed by Gary Messina, who held a number of positions within the United States Customs and Immigration Service within the Department of Homeland Security including Chief Technological Officer. He also worked as a managing director at Raytheon, one of the largest defense contractors in the world.

10. Gary Messina has performed the services relating to that IMV contract, including utilizing his extensive relationships both in the private sector and in government to organize and pursue activities relating to the interests and those in Africa, Asia and the Middle East.

11. I also performed services relating to the formation of that PAC, beginning on or about November 19, 2013, including participating in a series of meetings and engaging in research and preparation of documents. Based on my review of the total amount of time that I devoted to that project, I was owed and have retained the remaining $100,000. See Exhibit 2: Statement of Account to Declaration of Vincent Messina.

12. As of the fall of 2013, I became aware that World Capital Markets had received requests for information from the Securities & Exchange Commission. I also knew that Xu had retained the law firm of Wellman & Warren in connection with that matter. I was not involved in the representation of World Capital Market in relation to those SEC issues, but I was privy to some discussions and learned that Scott Warren's position was that World Capital Markets had done nothing wrong, and that it was engaged in permissible "multi-level marketing."

13. I was later advised that Mr. Warren had reached an agreement to settle the issues with the SEC in exchange for an agreement to cease raising money in the United States and repayment of amounts received from investors in the United States. As of early 2013, no SEC action had been brought relating to World Capital Markets, and I was informed that the settlement was moving forward with World Capital Markets having already repaid approximately $10 million to investors. I was told by Xu that the entire amount at issue in relation to the United

States was $15 million, and he believed that he should only have to pay another $5 million. Xu even stated that he was considering terminating Scott Warren because he believed that the proposed settlement of payment of another $10 to $12 million was too high.

14. As of early February, Xu was preparing to make an additional payment to the SEC to conclude that matter. He arranged for delivery of approximately $19 million, and it was suggested that the funds would be held by me. I declined to receive those funds because I was not involved in that matter. Those funds, which totaled approximately $19 million, were later transferred to another attorney, Simon Horsman.

15. It was my understanding, based on information from Xu and others, that the repayment by World Capital of $10 million combined with the $19 million transferred to Horsman was far greater than the *total* amount of funds raised by World Capital Markets from United States investors and would resolve the issues with the SEC. In fact, according to the SEC, WCM had received a total of approximately $69 million while only about 25% of that revenue derived from investors in the United States. According to those calculations, and given the $10 million that had already been repaid to United States investors, WCM owed an additional approximately $7 million.

16. I also knew that these funds that were being paid to the SEC constituted only a portion of the funds that had been raised by World Capital Markets globally, and that the larger percentage of the funds of World Capital Markets were not related to United States activities and were not at issue in the SEC's inquiry.

17. While those events were occuring, I also had discussions with Xu regarding his repeated statements to me that he wanted to assist in financing projects in Africa and elsewhere. In response, Xu stated that I am "like [his] father," and asked that I not be upset. He expressed his "love and appreciation" for me and stated that he "love me always." He also, on that date, arranged for the transfer of $5,000,000 to my account. Xu told me that he wanted those funds to be held and used for our future business endeavors. I responded that I would not "hold" funds in that way. He continued to insist that he wanted to assist in financing my efforts to continue to develop businesses. I explained that I would retain those funds only if we entered into an actual and *bona fide* loan. He agreed, and we then entered into a Loan Agreement, dated February 27, 2014, pursuant to which he would receive interest at the rate of 5% per annum for five years. Exhibit 4: Loan Agreement dated February 27, 2014.

18. I later determined that the funds that I received did not come from World Capital Markets. They were transferred by another entity, To Pacific.

19. On or about March 6, 2014, Xu then sent me a message stating that "Peter from SEC" had "requested the recall of $5M." Xu asked that I "approve the recall" of that $5 million and stated that I should keep the $200,000 paid to me as fees relating to the PAC, adding that he no longer needed a PAC.

20. I responded that I had wired out the money in accordance with the note I signed. Xu, still plainly under pressure from the SEC, pressed again on March 7, 2014, asking that I wire money to his bank to avoid being "harassed" by the SEC. I again confirmed that the funds have been expended and/or committed in accordance with the loan agreement.

21. Xu responded again, telling me that the SEC requests the money "and I have to follow and obey."

22. On March 20, 2014, Xu sent me a letter seeking repayment of those amounts. I was upset that he would go back on our agreement, and I sent him a communication stating that I was distressed by his actions and that the loan proceeds had, to a large extent, been disbursed or committed.

23. Those disbursements included funds to International Market Ventures ("IMV"), the firm that is run by Gary Messina. Those funds were disbursed to IMV in relation to the acquisition of an interest in CNC Consulting in Hong Kong. The funds were initially sent to IMV because Mr. Messina had agreed with CNC

that funds would be provided to IMV for a Cayman affiliate that would focus on business in the Congo and Libya.

24. After Ming Xu suddenly sought return of the loan funds on or about March 30, 2014, Gary Messina decided not to proceed with the formation of the Cayman affiliate and so $840,000 was transferred from IMV to CNC Consulting. An additional $100,000 was transferred by IMV to the Thompson Hine escrow account.

25. IMV retained only $100,000 of the funds that it received from me, and those were the funds relating to the political action committee.

Dated: August 22, 2014

*/s/ Vincent Messina*
Vincent Messina

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**
**CIVIL CODE § 1189**

State of California
County of Los Angeles

On August 22nd, 2014 before me, Rene R. Grigorian, notary public
    Date                                         Here Insert Name and Title of the Officer

personally appeared Vincent Messina
                                  Name(s) of Signer(s)

RENE R. GRIGORIAN
Commission # 2060393
Notary Public - California
Los Angeles County
My Comm. Expires Mar 8, 2018

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____
                Signature of Notary Public

Place Notary Seal Above

——— OPTIONAL ———

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827) Item #5907