MARANDA E. FRITZ
THOMPSON HINE LLP
335 Madison Avenue
New York, New York 10017
Phone 212 908-3966
Fax 212 935-1166
Email: maranda.fritz@thompsonhine.com

MARK L. SMITH (Cal. Bar No. 213829)
CLYDE SNOW & SESSIONS
633 West Fifth Street
26th Floor
Los Angeles, California 90071
Email: msmith@clydesnow.com

Attorneys for Relief Defendants
VINCENT MESSINA &
INTERNATIONAL MARKET VENTURES

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WORLD CAPITAL MARKET INC.; WCM777 INC.; WCM777 LTD. d/b/a WCM777 ENTERPRISES, INC.; and MING XU a/k/a PHIL MING XU,<br><br>Defendants,<br><br>KINGDOM CAPITAL MARKET, LLC; et al.<br><br>Relief Defendants. | Case No. CV-14-2334-JFW-MRW<br><br>**RELIEF DEFENDANTS' MESSINA AND INTERNATIONAL MARKET VENTURES' TRIAL BRIEF**<br><br>**Evidentiary Hearing**<br><br>**Date:** September 5, 2014<br>**Time:** 8:30 am<br>**Place:** Courtroom 16<br>**Judge:** Hon. John F. Walter |

## **Preliminary Statement**

On September 5, 2014, this Court will conduct an evidentiary hearing that, according to this Court's order, will consider the "legitimacy" of the Relief Defendant's claims to the property, *i.e.*, performance of services and receipt of funds as of a loan.

The parties do not agree on the extent of the issues that will actually be considered and decided at the hearing. The plaintiff maintains that this Court will adjudicate all aspects of its claim against the Relief Defendants: (1) whether the plaintiff can establish that the funds at issue constitute ill-gotten gains; and (2) whether the plaintiff can establish that the relief defendants cannot even state a legitimate claim to those funds, such that the issue would have to be addressed in a more fulsome proceeding and not through the truncated relief defendant process. The plaintiff also maintains that, even to the extent that the Relief Defendants have articulated a claim relating to the property, the Court should proceed to adjudicate the merits of that claim and decide the ultimate issue of whether the Relief Defendants' claim to the funds is valid.

Relief Defendants, on the other hand, maintain that the Court ordered a hearing regarding subject matter jurisdiction and that the Court will consider whether the plaintiff can establish that the Relief Defendants are unable even to state a claim to property. It is the position of Relief Defendants that the plaintiff cannot satisfy that burden of establishing that a claim has not been stated, and so the claims against the Relief Defendants should be dismissed so that the claims can be adjudicated in a proceeding that satisfied the requirements of due process relating to a deprivation of property.

If the Court decides to proceed with an adjudication of all issues relating to the merits of plaintiff's claims against the Relief Defendants, Relief Defendants maintain that the plaintiff cannot demonstrate either of the components of its claims against these Relief Defendants. There is an utter failure of proof on even the most elemental issue: whether the funds at issue constitute

"ill-gotten gains." The bulk of the funds in this case were transferred from an account in the name of ToPacific, and the plaintiff has failed even to attempt to demonstrate that those funds are proceeds derived from the alleged violations of law. The plaintiff has provided no credible analysis of the contents of that ToPacific account. Instead, the plaintiff appears confident that no scrutiny will be applied to its assertion that the funds "must have" been proceeds of a fraud, that it will receive the judgment that it seeks, and that no appellate court will assess the actual quantity and quality of the evidence that it put forth.

Even assuming that the plaintiff had overcome that initial hurdle regarding the source of the funds, it would then have to demonstrate that those funds that were received by ToPacific are derived from conduct that is within the scope of the plaintiff's claims. Specifically, the plaintiff has to show that the funds are sufficiently related to the United States such that it is governed by these securities laws. Here, the plaintiff has not even attempted to identify amounts that were derived from activity in the United States and/or from United States investors. Notably, the evidence shows that the plaintiff was provided by World Capital Markets with analysis regarding the quantity of funds relating to United States investors but has apparently assiduously avoided any consideration of the issue.

Further, assuming that the plaintiff has been able to establish that the funds were actually the proceeds of actionable conduct, the plaintiff can offer no evidence to controvert the Relief Defendants' position that the funds were transferred for services or as a loan. The plaintiff itself actually put forth evidence of the services that were provided by Mr. Messina, and cannot even claim that funds were not transferred for that purpose.

With respect to the loan, the plaintiff can provide no credible basis for its claim that the loan is not a loan, and in fact all of the evidence illustrates that the Loan Agreement was prepared and signed for the obvious reason that the transaction *was* a loan. There was no collusion; to the

contrary, the counterparties to that loan were quickly at odds. Nor was there any claim of any misrepresentation by Mr. Messina that could be relied on to vitiate a documented loan. Mr. Messina executed a loan agreement and has acted in accordance with it.

The plaintiff's claim is, in reality, nothing but a construct of its own making, unsupported by any evidence and contradicted by the record. The plaintiff contends that Mr. Messina supposedly entered into some kind of sham transaction with Mr. Xu to the effect that the funds were actually not a loan. But there is no evidence from Mr. Xu to support that, and there is no dispute that Mr. Messina then proceeded immediately to treat the funds as loan proceeds. Mr. Messina has consistently maintained that he would not and did not enter into that kind of sham transaction with Mr. Xu and the plaintiff's wholly unsupported version of events should be rejected.

## FACTUAL BACKGROUND

### 1. The Claims Against Relief Defendants

On or about May 7, 2014, the Securities and Exchange Commission amended its complaint against Ming Xu and World Capital Markets to add Vincent Messina and International Market Ventures ("IMV") as Relief Defendants based on a transfer of $5 million from ToPacific to Mr. Messina, and certain other transfers to Mr. Messina. First Amended Complaint [Doc. 50] filed May 7, 2014 (hereinafter referred to as "FAC").

In the FAC, the plaintiff acknowledged that there was a Loan Agreement relating to that transfer of $5 million, providing that Vincent Messina would repay to Xu a total amount of $5 million plus interest at the conclusion of a five-year term. FAC ¶ 101.

The Amended Complaint also confirmed that, on the World Capital website and elsewhere, Mr. Messina was identified as someone who performed services for World Capital Markets. FAC ¶ 5.

-4-

Thereafter, on May 21, 2014, the Court issued an order freezing assets of Vincent Messina and requiring an accounting. Order [Doc. 75] dated May 21, 2014.

Based on the allegations of the Amended Complaint, Relief Defendants moved to dismiss on the grounds that the relief defendant process is not applicable where, as here, the holder of the funds is asserting a claim to those funds. Motion to Dismiss Claims Against Relief Defendants [Doc. 80] dated June 2, 2014. The court thereafter continued the hearing on the Motion to Dismiss to July 21, 2014. Order [Doc. 83] dated June 9, 2014.

### 2. The Denial of Relief Defendants' Motion to Dismiss and the Scheduling Order

On July 10, 2014, this Court issued an order denying the motion to dismiss. Minutes in Chambers [Doc. 106] dated July 10, 2014. The Court also stated that "there are disputed issues of fact" regarding the claim of Vincent Messina to the funds and that an evidentiary hearing is required to resolve those disputes. The Court directed that the evidentiary hearing should be conducted on or before September 8, 2014.

Thereafter, on July 30, 2014, the Court issued an order setting the discovery cut off for January 20, 2015 and trial for March 31, 2015. Scheduling and Case Management [Doc. 122].

### 3. Evidence Regarding Whether the Funds Constitute Ill Gotten Gains

The plaintiff's evidence with respect to the source of funds consists of certain calculations and conclusions reached by accountant Maria Rodriguez as to amounts supposedly received by World Capital Markets from investors. Declaration of Maria Rodriguez [Doc. 141] ¶¶ 9 – 16. As an initial matter, that testimony is being offered without admission of any of the documents on which she supposedly relied and so is patently improper and inadmissible.

Equally clear is that her purported analysis is of no value and proves nothing. According to Ms. Rodriguez, she was assigned to determine the amount of investor money that had been received by the World Capital Markets entities. She has stated that, to perform that analysis, she

-5-

relied on the records of the bank accounts of the various entities. She then supposedly identified "investor funds" based on certain "factors" or characteristics and totaled those amounts. Id. at ¶¶ 11 – 16.

Every aspect of the methodology that she devised is contrary to any reasonable accounting process. The Receiver had recovered highly relevant source documents including the actual lists of investors, Quickbooks, and other financial records, but Ms. Rodriguez did not request, review or consider those records. She was aware that representatives of the company had provided to the plaintiff analysis of the total amount of investor funds, but declined to review or consider those records. Declaration of Maria Rodriguez [Doc. 17] at ¶ 33 – 34. Instead, she embarked on a completely arbitrary and fictional process of looking at bank records regarding deposits and deducing, on that basis alone, whether the deposits were "investor funds."

Further, her analysis lacked any adherence to any meaningful criteria. She claimed to have looked at factors such as the amounts and "pattern" of deposits and whether the funds were from individuals. In the end, however, the elasticity of her application of those factors was sufficient to allow her to label seemingly every deposit as "investor funds," whether it was in the hundreds of dollars or hundreds of thousands, whether it came from individuals or corporations, whether the only information was a "counter credit" or whether it came by wire, and whether the dollar amounts were consistent with the supposed World Capital Markets offering or were in amounts that appeared to bear no relation to those investment amounts.

In the process, she did not review or consider the documents that were obtained from World Capital Markets that included lists of investors and records regarding deposits. Ms. Rodriguez provided, additional information regarding her process during the deposition on August 28, 2014. She did not consider the information that was obtained by the Receiver from Ming Xu, nor did she speak to any of the employees of World Capital Markets that maintained

-6-

the records of investments. She did not speak to Edward King, who provided a declaration that was filed by the plaintiff and who will be testifying for the plaintiff. Certain financial records and lists of investors, and information from employees regarding the existing records, would be relevant, if not a critical aspect of any credible effort to determine the actual volume of investor funds. To so deliberately avoid any of that source information, and instead engage in a unguided extrapolation to reach baseless assumptions, appears to suggest a conscious avoidance of knowledge of those source materials.

Further, although she was aware that there were discussions regarding whether the funds were from investors in the United States – or were individuals in other countries dealing with people in other countries and depositing funds to foreign accounts – Ms. Rodriguez never separated the amounts relating to United States activity. She simply lumped all of it together and called it "investor funds."

And the issues concerning her analysis of the ToPacific deposits were even more acute. The ToPacific accounts, even according to Ms. Rodriguez, had different characteristics in terms of their opening date and the account activity. To deem the contents of that account "investor funds" required even greater liberties with her application of her "factors," to the point where, as she acknowledged in her deposition, amounts were included by her if they were small or large, if they came from individuals or corporations, if they were round numbers or not, if they came by wire or a counter deposit, if they corresponded to World Capital Markets investment "unit" or package amounts or were thousands of times those amounts, if they consisted of a singular transaction or a series of deposits. In other words, she used her purported analysis and fluid factors to designate *every single deposit* as "investor funds."

Remarkably, the plaintiff has also failed also to put forth any evidence regarding the alleged basis for transfer of funds by "investors" to ToPacific. As confirmed by Ms. Rodriguez,

analysis of supposed "ill-gotten gains" should begin with how those gains were gotten. Ms. Rodriguez, therefore, sought and obtained copies of what she believed were World Capital Markets documents that were disseminated to investors to induce their transfer of funds. Declaration of Maria Rodriguez Exs. 71 – 73. She saw documents reflecting that World Capital Markets offered "units" or "packages" for "cloud services" at particular prices. According to Ms. Rodriguez, she found no records that supported the actual provision of those cloud services.

With respect to funds received by ToPacific, she had no such materials. She confirmed that the funds were placed directly into ToPacific accounts; they were not for the most part, transfers from Defendant entities or individuals. But she located no materials that sought to cause any investor to pay funds to ToPacific, and had no information regarding the statements, *if any,* made to induce transfers to ToPacific. She simply assumed that it was somehow related or similar to the process whereby World Capital Markets solicited funds.

While one would ordinarily expect that information regarding an alleged fraudulent investment would come from the investors themselves, the plaintiff has offered not one declaration from anyone who transferred funds to ToPacific.

**4. Evidence Regarding United States Investors**

In at least one instance, Ms. Rodriguez analysis took into account the inherent limitations associated with enforcement of U.S. securities laws. With respect to an HSBC Hong Kong account, Ms. Rodriguez analyzed the "United States dollars" and declined to include in her analysis foreign currency into that foreign account. Not only is that methodology flawed – United States dollars may also come from foreign "investors" – but also she failed to apply that same methodology to any other accounts. Again, ignoring the abundant evidence of the actual identity and location of the "investors," including World Capital Markets' own lists of investors, including their location, was unreasonable and destined to lead to a deficient result.

-8-

### 5. Evidence Regarding Funds Provided for Services

Vincent Messina received a total of $245,000 that was, Mr. Messina maintains, related to the performance of services. A portion of that was paid in $5000 monthly increments, and corresponded to the period of time when Mr. Messina was identified as counsel by World Capital Markets.

The plaintiff has also provided a declaration of Edward King, a former employee of World Capital Markets, in which Mr. King confirms that he sought legal advice from Mr. Messina during that period.

There appears to be no dispute that those funds were paid for services, and that the services were performed.

An additional amount of $200,000 was transferred to Mr. Messina in December. Mr. Messina has confirmed that the funds related to the formation of a political action committee, and Ming Xu's own communications confirm that he had paid those funds to Mr. Messina for that purpose. Mr. Messina has also provided a statement regarding his disbursement of those funds. He applied $100,000 of the funds to a contract with International Market Ventures, and Gary Messina has confirmed that worked for more than 30 years with the Department of Justice and has vast experience in intergovernmental relations, particularly in Africa. Both Vincent and Gary Messina have also confirmed that International Market Ventures performed the services, and the plaintiff appears to offer no evidence or even argument to the contrary.

With respect to the remaining $100,000, Vincent Messina himself engaged in meetings and other services in relation to the development and formation of a political action committee. According to his statement of services, he performed services that exceeded the payment that he received.

-9-

### 6. Evidence Concerning the Loan

On February 27, 2014, Mr. Messina was advised by Ming Xu that he had transferred $5,000,000 to an account of Mr. Messina. The evidence will establish that the transfer was consistent with and a culmination of prior discussions between the two regarding Xu's interest in providing financing to Mr. Messina in relation to businesses with which Mr. Messina was involved.

Initially, Mr. asked that Mr. Messina "hold" those funds for future business activities but Mr. Messina declined to "hold" the funds. Xu then continued to speak with Mr. Messina about Xu's interest in providing funds to Mr. Messina to be used for the development of various businesses. Mr. Messina explained that he could retain and deploy the funds only if the two entered into an actual and *bona fide* loan. The two then entered into a Loan Agreement, dated February 27, 2014, pursuant to which Xu would receive interest at the rate of 5% per annum for five years.

Beginning on or about March 7, 2014, at the insistence of the SEC, Xu sought return of those amounts from Mr. Messina. Mr. Messina responded that the loan proceeds had, to a large extent, been disbursed or committed, and that Xu had no basis to suddenly repudiate the loan. Mr. Xu stated that the plaintiff had sought those funds and that he had to "obey."

### CONCLUSIONS OF LAW

**A.   Subject Matter Jurisdiction over a Relief Defendant**

As confirmed by the Ninth Circuit Court of Appeals, the relief defendant process, and the fact that it can be employed only to take property from a relief or "nominal" defendant, *i.e.*, one who "holds" property but is "not a real party in interest because he 'has no legitimate claim to the disputed property.'" SEC v. Ross, 504 F.3d 1130, 1141 (9th Cir. 2007) (citation omitted); SEC v. Cherif, 933 F.2d 403, 415 (7th Cir 1991) ("A nominal defendant holds the subject matter of the

litigation 'in a subordinate or possessory capacity as to which there is no dispute.'") (citation omitted). Accordingly, "there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction of the defendant is established." Colello, 139 F.3d at 676. Thus, only where the Relief Defendant literally asserts no interest in the property and has no claim that requires resolution is the Relief Defendant process appropriate.

Given those inherent limitations on the relief defendant process, the courts have found that *subject matter jurisdiction* does not exist over a relief defendant unless the SEC can establish that the relief defendant has no "legitimate claim" to the property. SEC v. Founding Partners Capital Mgmt., 639 F. Supp. 1291, 1293 (M.D. Fla. 2009) (collecting cases). The SEC bears that burden of establishing subject matter jurisdiction, as stated by the Ninth Circuit in Colello, "because the lack of a legitimate claim to the funds is the defining element of a nominal defendant." 139 F.3d at 677. Therefore, for subject matter jurisdiction to exist, the SEC has to adequately allege that the defendant has no legitimate claim to the property, *and* there can be no accusation of wrongdoing. Id. at 676; see also Founding Partners, 639 F. Supp. 2d at 1293. Otherwise, the real party in interest is not the property but the relief defendant, which requires adjudication of the relief defendant's relationship to the property and a separate jurisdictional basis. See Cherif, 933 F.3d at 414-15; CFTC v. Kimberlynn Creek Ranch, Inc., 276 F.3d 187, 191 (4th Cir. 2002).

Courts including the Ninth Circuit have specifically confirmed that the relief defendant process is not appropriate where the relief defendant asserts that funds were transferred in exchange for services. In Ross, funds were transferred in exchange for performance of services, the court found that they were therefore "presumptively" the property of the recipient, and held that the nominal defendant process may not be employed. 504 F.3d at 1142. In CFTC v. WeCorp, Inc., the relief defendant was an attorney who had received payments for services, and the plaintiff argued that his claim to the funds was not "legitimate" because he was operating

-11-

under a conflict of interest and did not provide equivalent value. 848 F. Supp. 2d 1195, 1200 (D. Haw. 2012). The court held that, *having asserted that he received the money as payment for services*, the relief defendant held "presumptive title" to those payments and "[p]erforming services in exchange for compensation is a sufficient claim of ownership to preclude relief defendant treatment." Id. at 1202. And in Founding Partners, funds were transferred as a loan and the court held that the plaintiff's effort to divest the defendant of the property rights associated with those funds was not susceptible of summary adjudication. 639 F. Supp. 2d 1291.

As explained in WeCorp, the relief defendant is obviously not required to establish the *validity* of his claim in the relief defendant proceeding; that would contravene all of the established authority confirming the need for a more appropriate proceeding with due process protections in which to actually adjudicate the right to property. 848 F. Supp. 2d at 1204. As confirmed in WeCorp, this issue of subject matter jurisdiction involves only the assertion and the *articulation* of a claim to the property, and not the ultimate validity or merits of the claim:

> a relief defendant may have a legitimate claim of ownership even if he ultimately may lose on the merits of a dispute over ownership *adjudicated in a court of competent jurisdiction*. To hold otherwise would permit the [regulator] to step into a primary violator's shoes and pursue all manner of claims against nominal defendants without ever alleging a violation of the [law] and without establishing any other independent basis for this Court to exercise jurisdiction over those defendants or claims." Id. at 1204 (emphasis added).

See also Founding Partners, 639 F. Supp. 2d at 1294 (where putative relief defendant asserted a claim to the property, the claim had to be addressed and resolved in an appropriate setting – not in the relief defendant process).

Here, the plaintiff cannot satisfy its burden of establishing that the Relief Defendants have failed to state a legitimate claim to the funds. The plaintiff's contentions surrounding that loan appear discordant at best. The plaintiff does not and cannot dispute the fact that the Loan Agreement was entered into, but nonetheless asserts that the loan is not a loan. The plaintiff

-12-

seems to be claiming that it was part of some illicit agreement between Mr. Messina and Mr. Xu. The plaintiff is even attempting to offer some kind of "opinion" from Receiver Krista Freitag that the Loan Agreement is not an appropriate commercial loan document. Yet the plaintiff also agrees that Mr. Messina promptly began transferring those funds into other accounts, and Gary Messina confirms that Vincent Messina, within days of the Loan Agreement, spoke with him about the loan and about how he intended to use the loan proceeds. Gary Messina confirms also that, weeks later, Mr. Messina expressed his agitation at the fact that, apparently frightened of the plaintiff, Mr. Xu was seeking to repudiate the loan and retrieve the funds to give to the plaintiff.

The plaintiff has failed to put forth any evidence from Ming Xu to support the claim that the loan was anything other than a loan. The plaintiff has failed to do so notwithstanding the fact that it negotiated and then entered into a resolution with Ming Xu in which the plaintiff elected ***not*** to seek Mr. Xu's cooperation as a witness. Any issues relating to the *merits* of the Relief Defendant's claims can be resolved only through an appropriate and fully litigated proceeding and should not be resolved in this proceeding.[1] The Court should, therefore, dismiss the claims against the Relief Defendants.

That these are not proper Relief Defendant claims is further illustrated by the nature of the relief sought by the plaintiff. Ordinarily the plaintiff must demonstrate, as against a relief defendant, that he "holds" property that is at issue and seeks an order directing turnover of the property. Here, the plaintiff is seeking relief relating not to property before the Court but rather directed against the two Relief Defendants themselves. The plaintiff is seeking orders directing

---

[1] Plaintiff contends that the loan is invalid and the Relief Defendants' claim is "specious" because the funds that were received by Messina were transferred by ToPacific, while the Loan Agreement is between Messina and Xu. Opp. Br. 14-15. In other words, the SEC claims Xu was somehow not authorized to direct the transfer of funds from ToPacific, Mr. Messina was supposed to have known that, and so Mr. Messina's claim that the funds were loaned to him is not "legitimate." In support of that argument, the plaintiff offers nothing: no statement from Xu or explanation of the corporate structure or extent of Xu's authority. Even if this Court were to decide to reach that argument, the plaintiff cites no authority – factual or legal – for its assertion and the claim should be rejected.

-13-

International Market Ventures to disgorge more than $1 million, although it retained only $100,000 and received no benefit from any other funds. The plaintiff is also seeking an order as against Mr. Messina in a total amount of more than $5 million. There can be no credible argument that, given the circumstances and the nature of the plaintiff's claim, it is the Relief Defendants – not the property – who are the real parties in interest and they are entitled to due process before the penalties sought by this plaintiff can be imposed.

Dated: August 29, 2014

THOMPSON HINE LLP

By: _____/s/_____
MARANDA FRITZ

CLYDE SNOW & SESSIONS

By: _____/s/_____
MARK L. SMITH

Attorneys for Relief Defendants
VINCENT MESSINA & INTERNATIONAL MARKET VENTURES