1

2

3

4

5

6

7               UNITED STATES DISTRICT COURT

8               CENTRAL DISTRICT OF CALIFORNIA

9

10  Securities and Exchange      ) Case No. **CV 14-2334-JFW(MRWx)**
    Commission,                  )
11                               ) **POST-HEARING FINDINGS OF FACT**
                    Plaintiff,   ) **AND CONCLUSIONS OF LAW AS TO**
12                               ) **VINCENT J. MESSINA AND**
        v.                       ) **INTERNATIONAL MARKET VENTURES**
13                               )
    World Capital Market, Inc., )
14  et al.,                      )
                                 )
15                  Defendants.  )
    _____ )
16

17  **I.    PROCEDURAL BACKGROUND**

18       In this enforcement action, Plaintiff Securities and Exchange

19  Commission ("SEC") alleges that Defendants Ming Xu, World Capital

20  Market, Inc. ("WCM"), WCM777 Inc., and WCM777 Limited

21  (collectively, "Defendants"), operating under the offering name

22  WCM777, conducted a pyramid and Ponzi scheme and fraudulently

23  misappropriated investor funds in excess of $80 million through an

24  unregistered offering of securities.  In the First Amended

25  Complaint filed on May 7, 2014, the SEC named Vincent J. Messina

26  and International Market Ventures ("IMV") as "relief defendants"

27  or nominal defendants and alleges that they hold proceeds of the

28  fraud.

On June 2, 2014, Relief Defendants Vincent Messina and IMV filed a Motion to Dismiss Claims on the grounds that they were not proper relief or nominal defendants because they allegedly have a legitimate claim to the funds [Docket No. 80].  On July 10, 2014, the Court denied the Motion to Dismiss Claims, but concluded that there were disputed issues of fact related to the legitimacy of Vincent Messina's and IMV's claims to the funds, and that an evidentiary hearing was required to resolve those disputed issues of fact.

On September 5, 2014 and September 17, 2014, the Court conducted an evidentiary hearing to determine whether Vincent Messina and IMV have a legitimate claim to any portion of the 5.2 million dollars that Vincent Messina received from Defendants. The Court heard from six witnesses, and admitted into evidence 138 exhibits offered by the SEC and 25 exhibits offered by Vincent Messina and IMV.

On October 8, 2014, the parties filed their post-hearing proposed Findings of Fact and Conclusions of Law.  After considering the evidence, and the parties' proposed Findings of Fact and Conclusions of Law, the Court makes the following findings of fact and conclusions of law:[1]

---

[1]The Court has elected to issue its findings in narrative form.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

II.   **FINDINGS OF FACT**

    A.   **Relief Defendant Vincent Messina**[2]

On June 6, 2013, Vincent Messina became WCM's in-house legal counsel. Vincent Messina was paid $5,000 per month for his services as in-house legal counsel during the period from June 2013 through February 2014 and he received a total of $45,000 for his services.

At all relevant times, Vincent Messina also served as general counsel for Relief Defendant IMV.

    B.   **Relief Defendant IMV**

IMV is a consulting firm based in Washington D.C., with correspondent offices in, among other places, Los Angeles, Hong Kong, and the United Arab Emirates.  Gary Messina is 100% owner, CEO, and president of IMV.  Gary Messina is the nephew of Relief Defendant Vincent Messina.

    C.   **Vincent Messina becomes aware of the SEC investigation**
            **in the fall of 2013.**

In the fall of 2013, Defendant Ming Xu, the chief executive officer of WCM (and chairman of Defendants WCM, WCM777 Inc., and WCM777 Ltd.), retained attorney Scott Warren, of the law firm

---

[2]After carefully listening to Vincent Messina's testimony and observing his demeanor at the evidentiary hearing, the Court finds that a substantial portion of Victor Messina's testimony was not credible.  The Court finds that Vincent Messina's testimony on important facts came across as contrived and evasive and that his long, rambling, non-responsive answers to simple, straightforward questions were designed to avoid directly answering questions that would be harmful to his position.  On several occasions, Vincent Messina contradicted himself and his testimony was contradicted or impeached by documents and by testimony from more credible witnesses.  The Court was left with the distinct impression that Vincent Messina was prepared to say whatever he deemed necessary in an attempt to hold on to the $5 million transferred to him by ToPacific Inc. without particular regard to the truth.

Wellman & Warren, to represent Defendants in connection with
investigations by the Commonwealth of Massachusetts and the State
of California into an offering made under the name "WCM777." In
October 2013, Defendants became aware that the SEC was also
investigating the WCM777 offering and WCM, WCM777 Inc., and WCM777
Limited.

In October 2013, shortly after being retained, Scott Warren
advised Defendants to immediately stop all worldwide operations
and cease raising money from investors. He informed Xu that, in
his opinion, WCM777 was operating as a Ponzi scheme, illegal in
every state, as well as every country in the world. He also
advised Xu that WCM777 was an illegal pyramid scheme, and that it
violated state and federal securities laws.

Vincent Messina admits that he became aware of Defendants'
problems with various securities regulators in the fall of 2013.
In fact, Xu instructed one of Defendants' employees, Edward King,
to update Vincent Messina concerning the status of the SEC
investigation so that Vincent Messina could help Xu protect his
assets.

**D.   WCM transfers $200,000 to Vincent Messina in December 2013.**

On December 17, 2013, Defendant WCM disbursed $200,000 from
its account at Bank of America to Vincent Messina. Vincent
Messina deposited that $200,000 into an Interest on Lawyers Trust
Account ("IOLTA") that he held at Wells Fargo (account ending in
0382). Although there is no contract or writing that reflects the
purpose of this transfer of funds, Vincent Messina claims that
these funds represented fees for services related to the formation

1  of a political action committee ("PAC") requested by Xu.

2  According to Vincent Messina, he performed services relating to

3  the formation of that PAC, beginning in November 2013, which

4  included participating in a series of meetings and engaging in

5  research and preparation of documents.

6      Vincent Messina also retained his nephew's company, IMV, to

7  assist him in the formation of the PAC and entered into a

8  Consulting Contract with IMV dated December 4, 2013 for those

9  services. (Exhibit 219).  According to the Consulting Contract,

10  the fee for the services to be rendered by IMV "shall consist of a

11  payment of Two Hundred Thousand Dollars consisting of two

12  payments: (1) One Hundred Thousand Dollars upon the execution of

13  this agreement and (2) One Hundred Thousand Dollars on June 1st

14  2014." (Exhibit 219).

15  **E.    Vincent Messina offers to help Xu conceal his assets**

16  **       from the SEC.**

17      In a chat message dated February 6, 2014, Vincent Messina

18  advised Xu to fire Defendants' SEC counsel, Scott Warren.  Vincent

19  Messina wrote:

20      Dr. Phil, I think u should drop Scott and retain the

21      Washington lawyer.  Bob told me that he wants u to

22      settle for 64 million which is ridicolous [sic].  You

23      need a lawyer who is highly experienced in SEC matters.

24      Scott does not seem to have that background. You will

25      have to change immediately if he recommends u settle for

26      such an outrageous amount.

27

28

5

(Exhibit 22 at page 31).[3] In this same February 6, 2014 chat exchange, Xu told Vincent Messina that Warren "was about to get us a settlement for about 10-12 million dollars and without criminal charges." (Exhibit 22 at page 32). In response, Vincent Messina advised Xu that the SEC does not bring criminal charges and that delaying the negotiations with the SEC would allow time to make Defendants' assets "seem less." Specifically, Vincent Messina wrote:

> By the way the SEC does not have the power to bring a
> criminal charge. That is the decision of the US
> Attorney which is entirely separate from the SEC.
> Perhaps the new counsel can delay the negotiations so
> that your assets seem less. I have tried to look at your
> transactions from the standpoint of rearranging them,
> but have not been able to get the required information.

(Exhibit 22 at page 33).

Although Xu heeded Vincent Messina's advice and terminated the services of Scott Warren on February 6, 2014, Xu quickly rehired him the following week.

As of February 11, 2014, Vincent Messina was fully aware that no settlement had yet been reached with the SEC and that the SEC investigation was ongoing. (Exhibit 14).

**F.    Xu transfers $5 million to Vincent Messina in February 2014.**

On February 26, 2014, less than three weeks after Vincent Messina advised Xu that delaying the negotiations with the SEC

_____

[3]Ming Xu is also known as Phil Ming Xu.

would allow time to make Defendants' assets "seem less," Relief Defendant ToPacific Inc. transferred $5,000,000 from its account at Comerica Bank (account ending in 0854) to Vincent Messina's Bank of America attorney trust account (account ending in 2887). It is undisputed that Xu caused the transfer of the $5 million to Vincent Messina.[4]  In its general ledger, ToPacific Inc. recorded the $5 million transfer to Vincent Messina as an "uncategorized expense." However, there was no record of the payee.

Vincent Messina did not learn that Xu transferred the $5 million until after the transfer had already occurred.  In a rare moment of candor, Vincent Messina admitted that, after the transfer occurred, Xu asked Vincent Messina to "hold" the funds for undefined, future business endeavors.  According to Vincent Messina, he declined to "just hold" the funds because there is nothing for him to gain, there would be no purpose in doing so, and "[i]t doesn't make any sense." (9/5/2014 Tr. at 180:16-23). Instead, on February 27, 2014, in an attempt to make the transfer appear legitimate or less suspicious, Vincent Messina prepared a purported seven-line loan agreement, which, in its entirety, provides:

**AGREEMENT**

This Agreement ("Agreement") is entered into on February 27, 2014, between Vincent J. Messina and Ming Xu.

---

[4]According to the SEC's First Amended Complaint, Xu is ToPacific Inc.'s sole director and was the signatory on ToPacific's bank account.

1      **FOR VALUE RECEIVED,** Vincent J. Messina promises to pay

2      to Ming Xu without recourse the sum of Five Million

3      Dollars ($5,000,000) with interest computed at five

4      percent (5%) per annum, interest and principle due on

5      January 2, 2019 at his place of business.

6

7   (Exhibit 30).  Ming Xu and Vincent Messina signed the purported

8   loan agreement on February 27, 2014.

9      According to Vincent Messina, the "no recourse" language in

10  the purported loan agreement meant that Xu would have absolutely

11  no recourse against him personally, and that Xu's only recourse if

12  Vincent Messina did not repay the $5,000,000 "would be against

13  those properties," if any, that were "invested in" by Vincent

14  Messina.[5]  (9/5/2014 Tr. at 183:7-18).  Vincent Messina testified

15  that he had no "legal obligation" to repay the $5,000,000, but had

16  a "moral obligation" to do so.  (9/5/2014 Tr. at 186:17-187:3).

17    **G.   Xu asks Vincent Messina to return $5 million.**

18      Just one week later, on March 6, 2014, in a chat exchange, Xu

19  asked Vincent Messina to return the $5 million so that he would be

20  able to partially fund a settlement with the SEC:

21      Father Vince, I just knew that Peter from SEC called my

22      banker to freeze the money and also requested the recall

23      of $5M.  So this is public domain and will endanger your

24      position.  Please don't move the money and approve the

25      recall.  I don't want you to get into this trouble.

26  ─────────────────

27    [5]However, any such recourse was entirely illusory because
Vincent Messina admitted that he did not intend to invest any of

28  the $5 million in any property that would be jointly held with Xu.
(9/5/2014 Tr. at 183:19-21).

1          Because of all this trouble, please keep $200k I have

2          given to you as your fees.  I don't need a PAC at this

3          stage.

4    (Exhibit 54 at 185).  Vincent Messina falsely responded:  "The

5    money has already been wired out and is [in] accordance with the

6    note I signed."  (Exhibit 54 at 185). Contrary to Vincent

7    Messina's statement to Xu, as of March 6, 2014, Vincent Messina

8    still held approximately $4.925 million of the funds transferred

9    by Xu in his personal or client trust accounts, and IMV held

10   $175,000 of the funds transferred by Xu in its accounts.  In fact,

11   Vincent Messina had only transferred $100,000 of the $5.2 million

12   to a third party, and that third party, Mohammed el Fatih Saeed,

13   was closely affiliated with Vincent Messina and IMV.[6]

14        **H.    Vincent Messina transfers $1,050,000 to IMV.**

15        After receiving the $200,000 in December 2013 and the $5

16   million in February 2014 from Defendants, Vincent Messina engaged

17   in a series of unexplained, suspicious, and questionable banking

18   transactions.  He transferred part of the money to several bank

19   accounts he controlled, opened new bank accounts, transferred some

20   of the money to those new accounts, and ultimately transferred

21   approximately $3 million of the funds to his business partners and

22   long-term associates.  Many, if not all, of the transactions and

23   transfers have no discernible or legitimate business purpose.

24   (Exhibit 93).

25        Vincent Messina transferred a total of $1,050,000 of

26   Defendants' funds to IMV, consisting of the following transfers:

27   _____

28        [6]Mohammed el Fatih Saeed is in charge of IMV's correspondent
     office in the United Arab Emirates.

$175,000 on March 3, 2014; $125,000 on March 10, 2014; $350,000 on March 24, 2014; and $400,000 on March 29, 2014.

Gary Messina testified that approximately $100,000 of those funds represented fees for IMV's services performed in connection with the PAC Consulting Agreement,[7] and that the balance of the funds "related to a potential business venture that would be undertaken as part of an agreement with CNC Consulting Limited."[8] (Declaration of Gary Messina [Docket No. 152] at ¶ 5). Soon after receiving the $1,050,000, Gary Messina realized that there was a dispute between Xu and Vincent Messina relating to the funds. (*Id.* at ¶ 6) As a result of that dispute and because of some health issues, Gary Messina informed Vincent Messina that he no longer wanted to be involved with the proposed venture with CNC Consulting Limited. (*Id.* at ¶¶ 7-8; 9/5/2014 Tr. at 226:22-227:3).

Gary Messina testified that he would have, without question, followed Vincent Messina's instructions and sent the money whenever and wherever Vincent Messina told him to send it.

---

[7]At the evidentiary hearing, Gary Messina testified that IMV received approximately $109,000 for services performed in connection with the PAC Consulting Agreement. (9/17/2014 Tr. at 87:3-18) According to the Court's calculations, IMV received approximately $108,495 related to the PAC Consulting Agreement.

[8]According to the terms of an unexecuted Stock Sale and Purchase Agreement (Exhibit 223), dated March 1, 2014, Vincent Messina, Gary Messina, Mohammed Saeed, and Andrew Savor (collectively, the "Buyers") agreed to purchase 800 shares of CNC Consulting Limited for $5 million. In addition, a new Hong Kong corporation would be formed with CNC Consulting Limited and the Buyers as the principal stockholders. CNC Consulting Limited would receive 34.5% of the outstanding voting shares of the new corporation in exchange for $5 million, and the Buyers would receive the remaining 65.5%. Notably, IMV was not listed as a buyer and would not receive any shares under the terms of the agreement. (Exhibit 223). The Buyers failed to pay the $5 million required for the purchase of CNC Consulting Limited's shares. (9/5/2014 Tr. at 227:7-14).

1  (9/17/2014 Tr. at 92:12-22).  In fact, Gary Messina testified
2  that, as of April 1, 2014, when IMV still had most of the
3  $1,050,000 in its accounts, he would have returned the money
4  (minus what he was owed for his PAC work) to Vincent Messina if
5  Vincent Messina had told him that Xu wanted the money back.
6  (9/17/2014 Tr. at 73:15-22, 74:19-24).

7      Even though IMV and Gary Messina never performed any services
8  that could possibly justify the transfer of $941,505 of the
9  $1,050,000 to IMV's accounts, Gary Messina failed to return any
10  portion of those funds to Vincent Messina.  Instead, although Gary
11  Messina was aware that Defendants were the original source of the
12  funds and that Defendants were under investigation by the SEC for
13  violation of the securities laws, Gary Messina chose to act as a
14  mere conduit for the funds and willingly transferred those funds
15  to third parties as directed by Vincent Messina.

16      **I.   IMV transfers approximately $840,000 to Andrew Savor.**

17      On April 1, 2014, just two days after Vincent Messina
18  received a copy of the Temporary Restraining Order and Asset
19  Freeze entered by the Court on March 27, 2014 (Exhibit 29),
20  Vincent Messina instructed Gary Messina to wire $840,485 of the
21  funds he had transferred to IMV to Andrew Savor's account at Bank
22  of Nova Scotia.  Andrew Savor is a long-time associate of Vincent
23  Messina and Gary Messina.  According to Vincent Messina, Andrew
24  Savor was the "agent" for CNC Consulting in Canada.

25      After Gary Messina wired $840,485 to Savor's account at Bank
26  of Nova Scotia on April 1, 2014, the funds were frozen by the
27  bank, while it conducted a fraud inquiry.  Gary Messina
28  corresponded with Bank of Nova Scotia in an effort to secure the

release of the funds.   In doing so, he provided false and
misleading information to the bank concerning the source of the
funds, his obligation to repay the funds, and the terms under
which he had provided the funds to Savor.  (9/17/2014 Tr. at 55:7-
57:3, 60:13-61:21; Exhibits 165, 166).  On Friday, April 11, 2014,
apparently based on the information provided by Gary Messina, Bank
of Nova Scotia returned the money to IMV's Wells Fargo account.

Shortly thereafter, Gary Messina informed Vincent Messina
that the funds has been returned.  Vincent Messina instructed him
to re-send the funds to Savor only at a different bank.   In
accordance with those instructions, on Monday, April 14, 2014,
Gary Messina wired approximately $841,505 from IMV's account to
Savor's account at Toronto Dominion Bank.

In addition, pursuant to Vincent Messina's instructions, Gary
Messina wired the remainder of the funds he received from Vincent
Messina, amounting to $100,000, to Thompson Hine LLP to be held in
an escrow account.

**III. CONCLUSIONS OF LAW**

**A.   Legal Standard Governing Nominal or Relief Defendants**

"Nominal defendant status is an obscure common law concept
that has come to be applied in the context of the Securities
Exchange Act [ ] of 1934." *Commodities Futures Trading Commission
v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191 (4th Cir. 2002)
(quotations and citations omitted).  A relief or nominal defendant
"is a person who holds the subject matter of the litigation in a
subordinate or possessory capacity as to which there is no
dispute." *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)
(quotations and citation omitted). "As the nominal defendant has

1  no legitimate claim to the disputed property, he is not a real

2  party in interest." *Id.* A "relief" or "nominal" defendant "can

3  be joined to aid the recovery of relief without an assertion of

4  subject matter jurisdiction only because he has no ownership

5  interest in the property which is the subject of litigation." *SEC*

6  *v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991). "Although the

7  paradigmatic example of a nominal defendant is a 'bank or trustee

8  [that] has only a custodial claim to the property,' the term is

9  broad enough to encompass persons who are in possession of funds

10  to which they have no rightful claim, such as money that has been

11  fraudulently transferred by the defendant in the underlying

12  securities enforcement action." *SEC v. Ross*, 504 F.3d 1130, 1141

13  (9th Cir. 2007) (quoting *Colello*, 139 F.3d at 677).

14      Federal courts have "broad equitable powers" which "can be

15  employed to recover ill gotten gains for the benefit of the

16  victims of wrongdoing, whether held by the original wrongdoer or

17  by one who has received the proceeds after the wrong." *Colello*,

18  139 F.3d at 676. Federal courts therefore have "inherent

19  equitable authority to issue a variety of ancillary relief

20  measures in actions brought by the SEC to enforce the federal

21  securities laws," which "extends over third parties to the

22  action." *Id.* (quotations and citations omitted).

23      To obtain relief against a nominal defendant, the SEC must

24  demonstrate that the nominal defendant (1) received ill gotten

25  funds and (2) does not have a legitimate claim to those funds.

26  *See Colello*, 139 F.3d at 677. "Performing services in exchange

27  for compensation is a sufficient claim of ownership to preclude

28  relief defendant treatment." *U.S. Commodity Futures Trading*

13

1   *Commission v. WeCorp, Inc.*, 848 F. Supp. 2d 1195, 1202 (D. Haw.
2   2012) (citing Ross, 504 F.3d at 1142).   "However, a claimed
3   ownership interest must not only be recognized in law; it must
4   also be valid in fact.   Otherwise individuals and institutions
5   holding funds on behalf of wrongdoers would be able to avoid
6   disgorgement (and keep the funds for themselves) simply by stating
7   a claim of ownership, however specious."   *Kimberlynn Creek Ranch,*
8   *Inc.*, 276 F.3d at 192.   "A claim of ownership is not legitimate
9   where the relief defendant holds the funds in trust for the
10  primary violator, the ownership claim is a sham, the relief
11  defendant acted as a mere conduit of proceeds from the underlying
12  statutory violation, or some similar specious claim to ownership."
13  *WeCorp, Inc.*, 848 F. Supp. 2d at 1202 (citing *Ross*, 504 F.3d at
14  1141-42).

15      **B.   Vincent Messina does not have a legitimate claim to**
16          **$5,000,000 of the $5,200,000 he received from**
17          **Defendants.**

18      The Court concludes that the SEC has demonstrated that
19  Vincent Messina has no legitimate claim to the $5,000,000 he
20  received from ToPacific Inc. on February 26, 2014.   Indeed, the
21  Court finds that the loan agreement was a sham and was merely a
22  vehicle designed by Vincent Messina to make Defendants' assets
23  "seem less," with the goal of keeping the $5 million out of the
24  reach of the SEC. In making this finding, the Court relies on,
25  *inter alia*, the following: (1) Vincent Messina advised Xu on
26  February 6, 2014 to delay the SEC negotiations so that they could
27  make Defendants' assets "seem less;" (2) less than three weeks
28  later, Xu transferred $5 million to Vincent Messina's IOLTA

1   account without Vincent Messina's knowledge and before any

2   discussion of a potential loan; (3) Xu requested that Vincent

3   Messina simply "hold" the $5 million for some undefined future

4   business endeavors; (4)the purported loan agreement prepared by

5   Vincent Messina after the transfer of the funds lacks any of the

6   normal characteristics or indicia of a valid commercial note or

7   loan agreement (*e.g.,* it does not contain any provisions governing

8   the rights of the parties in the event of default and it contains

9   a promise to pay Xu instead of ToPacific Inc., the source of the

10  funds); (5) ToPacific Inc. recorded the $5 million disbursement to

11  Vincent Messina as an "uncategorized expense" and failed to record

12  the name of the payee in its records;(6) Vincent Messina did not

13  believe that he had any legal obligation to repay the $5 million;

14  and (7) Xu asked Vincent Messina to return the $5 million.

15       However, the Court also concludes that the SEC has failed to

16  demonstrate that Vincent Messina does not have a legitimate claim

17  to the $200,000 that he received from the Defendants on December

18  17, 2014.  Vincent Messina testified that the $200,000 related to

19  the formation of a PAC, and there is a signed Consulting Contract

20  with IMV dated December 4, 2013 for services relating to the

21  formation of that PAC.  The $200,000 transfer occurred almost two

22  months prior to Vincent Messina's advice to Xu that he make

23  Defendants' assets "seem less," and when Xu asked Vincent Messina

24  to return the $5,000,000, Xu explicitly referenced the PAC and

25  implicitly confirmed that he had previously asked Vincent Messina

26  to form a PAC, stating: "please keep $200K I have given to you as

27  your fees.  I don't need a PAC at this stage."

28

    **C.    IMV does not have a legitimate claim to $941,505 of the money it received from Vincent Messina.**

In addition, the Court concludes that the SEC has demonstrated that IMV has no legitimate claim to $941,505 of the $1,050,000 that Vincent Messina transferred to IMV.  Indeed, IMV and Gary Messina did not perform any services in exchange for that money and were merely holding the funds pending instructions from Vincent Messina.  Tellingly, Gary Messina testified that he would have immediately sent the money whenever and wherever Vincent Messina told him to send it, and even would have returned the money if Vincent Messina told him that Xu wanted the money back, demonstrating that IMV acted as a mere conduit of the funds.

However, as discussed, the Court concludes that the SEC has failed to demonstrate that IMV does not have a legitimate claim to $108,495, which represents the money IMV received in connection with the PAC Consulting Agreement.

**IV.   CONCLUSION**

Based on the foregoing findings of fact and conclusions of law, the Court concludes that: (1) Vincent Messina does not have a legitimate claim to the $5 million that he received from ToPacific Inc.; and (2) IMV does not have a legitimate claim to $941,505 of the funds that it received from Vincent Messina.  Given the limited scope of the evidentiary hearing, the Court makes no findings or conclusions with respect to whether those funds were proceeds of the fraud or whether those funds should be disgorged.

Dated: November 14, 2014

JOHN F. WALTER
UNITED STATES DISTRICT JUDGE

16